UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

| | |
|---|---|
| INTEGRAL DEVELOPMENT CORP., a ) Delaware corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> VS. ) <br> ) <br> VIRAL TOLAT, an individual, ) and DOES 1-30, ) <br> ) <br> Defendants. ) <br> _____) | No. C 12-6575 JSW (LB) <br><br><br><br><br><br><br><br><br> Pages 1 - 31 |

San Francisco, California
Monday, April 22, 2013

**TRANSCRIPT OF PROCEEDINGS OF THE**
**OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES**:

For Plaintiff (By telephone):
                ComputerLaw Group LLP
                401 Florence Street
                Palo Alto, California  94301
     BY:  **JACK RUSSO, Attorney at Law**
          **ROBERT LUX, Attorney at Law**

For Defendants (By telephone):
                Katten Muchin Rosenman LLP
                575 Madison Avenue
                New York, New York  10022-2585
     BY:  **STEVEN ECKHAUS, Attorney at Law**

Transcribed By:     Candace Yount, CSR# 2737, RMR, CCRR
                 Contracted Court Reporter/Transcriber
                 candace.yount@gmail.com

Computerized Transcription By Eclipse

1  <u>Monday - April 22, 2013</u>                              <u>3:34 p.m.</u>

2                    **P R O C E E D I N G S**

3                         ---oOo---

4        **THE CLERK:**  Calling civil action C 12-6575, Integral

5  Development Corp. vs. Viral Tolat.

6       Counsel, please state your appearances for the record.

7        **MR. RUSSO:**  Jack Russo, Rob Lux, for the plaintiff

8  Integral.

9        **MR. ECKHAUS:**  Steven Eckhaus for the defendant Viral

10  Tolat.

11        **THE COURT:**  Okay.  Good afternoon to all of you.

12       Okay.  So I'm sorry to just kind of get you on the phone

13  last minute.

14       I -- I -- I just pulled my papers together.  It's been a

15  long time day.  Let me just pull up the papers in a sec and

16  just make sure that the letter's in here.  Here it is.

17       Okay.  The letter's right here.

18       Okay.  Give me a second.  I've been going from hearing to

19  hearing to hearing.

20       All right.  So here's -- I just wanted to have a little

21  chat with you guys about -- about my reactions.  I -- I -- I

22  wanted to get you on the phone because there have been a kind

23  of back and forth about the redactions.

24       Even though you filed your letters on April 11th, we

25  didn't get the redacted -- unredacted versions until

April 15th.  I -- I heard from Dan that -- my law clerk -- I

think this was this case -- that you had tried to call me maybe

on Friday, but I was in an all-day Settlement Conference.  And

then I noticed from your papers that you had tried to get ahold

of me in March.

     First, I'm sorry about that.  I think what you'd probably

done, looks like from your papers, was to call Lashanda, who's

my Courtroom Deputy, and she just -- she goes home at 3:00 or

3:30.

     And so my order that I kick out -- I just amended my

standing order for you guys to clarify that, for discovery

disputes, you should call the main number in my office, which

is 522-4660, and find me whenever Lashanda's gone for the day.

She gets in at some ungodly hour and, you know, leaves at 3:00.

There's no way to get ahold of me, and she's in the Clerk's

Office.

     So, with all that procedural context, I'm going out of

town for a conference tomorrow.  I thought it was worth just

getting you on the phone to talk about this because it seemed

there had been a few barriers to easy access to me previously.

     As far as the -- Let's talk about the deposition first and

then you can tell me how you want to talk about this.  So I'll

tell you my reaction and then you can tell me what we should

do.

     Judge White, as you probably know, has very specific rules

1  about how he likes his cases to proceed, and those are

2  reflected in the Standing Order and then he has a Standing

3  Order on depositions.

4      I don't have the Standing Order on depositions right in

5  front of me, but it says something like what the rule is, which

6  is relevance objections are improper and reserved.  And he says

7  that explicitly.

8      And -- And then I looked at this, and, you know, look, I

9  understand the lay of this case, and we can talk about how

10  we're going to have this conversation.  And my order will say

11  nothing that -- just because I don't believe in doubling prior

12  orders, and I believe we can talk about things without having

13  to say anything.

14      But -- So ruling on the relevance objections are probably

15  improper.  The questions come up within about a half an hour

16  into the deposition, which basically does reflect the

17  significance counsel attached to them.  I mean, there may be

18  marginal -- This is just me and you can tell me in a minute why

19  I'm getting this wrong.

20      And I'm not saying this critically, but there's sort of a

21  "gotcha" quality to it and it looks to me, because I read

22  everything in your file just for interest, in your electronic

23  file, and it looked like that sentiments can be inflamed in an

24  employment context instance like this.

25      There were bumps along the way that are referred to in the

 1  unredacted versions of your letter.  And then maybe, you know,

 2  that Integral didn't want the relationship to end, and -- and I

 3  don't know what's -- what all of the context was, but I know in

 4  the end that -- that, you know, it got kind of fiery there.

 5      And so -- so relevance objections are improper and, at the

 6  same time, it's -- it's -- the questions are marginal relevance

 7  at best so that I'll take Integral's arguments about why they

 8  are relevant at face value.  I think you can make those

 9  arguments.

10      But, you know, I think whether they come in under straight

11  403 standards -- 40 -- straight Rule 402 standard is on the

12  edge.  And then, under Rule 403 analysis, it seems like it's

13  pretty complicated.  And so there's something to the reaction

14  that Mr. Tolat's counsel had.  And so there's that line that's

15  there.

16      And then I also wondered, on a very practical level, which

17  is the question I want to start first, is, you all -- didn't

18  you all have private mediation in March?  I saw that on your

19  deadline, March 14th.  And it didn't seem to me this was

20  necessarily a good way to -- to -- to -- to spur any kind of a

21  resolution if this was the kind of case that could resolve,

22  which it seems to me that -- that there's room for employment

23  relationships to be mediated towards a -- if not an amicable

24  resolution, at least a putting down the weapons and walking

25  away in different directions.

1      So it just -- And then, finally, with all of that, so I

2 thought, well, Integral's full day of questioning wasn't a very

3 good, you know, relief given that it was 30 minutes you

4 allotted for it and -- Well, I think plaintiff probably should

5 have responded and responded just answer directly.

6      So I think there's something to the -- You know, it's

7 teetering towards the crossing the line, which is what

8 Mr. Tolat's counsel pointed out.

9      So, first, those are my reactions to the deposition flame

10 throwing.  I -- And I -- I just say that descriptively.  I

11 understand that tempers can get heated in situations like that,

12 especially from the client's perspective.

13      So I thought I'd first ask you, you know, what happened

14 with your Court-sponsored mediation -- or your private

15 mediation.  Are you going back?  Is it finished?  Are you

16 making progress?  What's going on there?

17      Don't tell me specifically, but just kind of --

18      **MR. RUSSO:**  (Unintelligible) which it made sense to us

19 to -- to get both private and -- and -- and Federal mediators

20 involved.  I opposed that.

21      I've been in touch with Rob Lux and just (unintelligible)

22 a couple times the last few weeks and we haven't had a

23 scheduled dep -- scheduled one yet, but we are getting close

24 to -- to both getting -- getting one schedule either privately

25 or -- or even one of the Federal Magistrate Judges.

 1      **THE COURT:**  Okay.  And we have some very gifted judges

 2   here and Judge White will, you know, refer you, either someone

 3   you asked for specifically or just a random referral.

 4      You should know people's schedule.  You don't have any

 5   deadlines set, although you had an earlier private mediation

 6   deadline.  But it takes awhile to get on people's calendars, so

 7   if you have a proposal or a referral from Judge White.

 8      Even if you're going to explore private mediation as

 9   step 1, you should suggest it to him, so that's just an

10   observation.

11      So -- So what's your -- So -- So, do you -- do you -- So,

12   from Integral's perspective, I guess what I would suggest is:

13   Again, very, very practically, you've got documentary points of

14   reference.

15      These are fact questions that are capable of being

16   ascertained what happened.  You have maybe a disagreement about

17   what the computer download issue was, but there is -- as far as

18   what the cause of it, but there was a -- a computer use issue

19   that's capable of being demonstrated.  And then there's the --

20   what people will say about the person -- other personal issues

21   that attended business travel.

22      And -- And, you know, my overwhelming take-away is, okay,

23   maybe you're right and maybe they should have answered,

24   because -- or maybe they're right and it's skirting awfully

25   close to that line that Rule 37 sets forth, especially with

1  what looks like evidence that's not -- that's -- that's going

2  to be problematic.

3       And -- And maybe for now, without prejudice, we should

4  just let it lie and see how things shake out because I can tell

5  you one thing that won't help settlement is depositions on this

6  point right now.

7       And maybe, too, if there end up dates that you really need

8  later, maybe there's some way we can figure out a way if you

9  think there really is information beyond the fact record.

10      And so this is a way of saying that I don't know that I

11 would have asked all those questions quite in that way.  And I

12 understand that you have temperatures heated and I don't think

13 I would have instructed my -- I don't think I would have kind

14 of called it to a halt in the way that defendant's side did,

15 either.

16      So I'm not sure that there's a -- an easy answer about

17 what ought to happen next except that it's probably not in

18 everybody's interest right now.

19      Does anyone have any reaction to that right now?  So it

20 would be kind of a let's table this without prejudice and let

21 things shake out.

22      **MR. ECKHAUS:**  My only reaction was that I didn't -- I

23 didn't -- I still didn't stop him from tes -- I didn't -- I

24 didn't instruct him not to answer.

25      I -- I think I discussed with Mr. Russo whether there were

1 things -- there were questions, and then my -- my -- my people

2 at the depositions at that point were thinking we would call

3 Your Honor in lieu of making a motion under Rule 33(a).

4          **THE COURT:**  Yeah.

5          **MR. ECKHAUS:**  So that -- that -- that -- that's right

6 because I don't think it was a question of --

7          **THE COURT:**  No, I agree.  I agree.  I read the

8 transcripts.  I -- These are, like, my public record takeaways

9 of it because this is how I wrote it down.  Because I obviously

10 read the transcript.

11      And I -- It's a -- I said Integral's counsel asked

12 Mr. Tolat certain questions and Mr. Tolat's attorney asked for

13 context in an (unintelligible) of relevance.

14      Then Interval's counsel followed with questions related to

15 network issues and Mr. Tolat responded to the allegations.

16      Then the -- I -- Then the transcript shows a heated debate

17 between the lawyers and an attempt to call the Court.

18      And then I say --

19          **MR. RUSSO:**  There was --

20          **THE COURT:**  And then --

21          **MR. RUSSO:**  Sorry, Your Honor.  Jack Russo here.

22      There was an instruction not to answer.  The witness was

23 in the process of answering when Mr. Eckhaus said, "No, we're

24 going to stop the deposition here and call the -- call the

25 Magistrate.

1          **THE COURT:**  Right.

2          **MR. ECKHAUS:**  Off the record, I said to him, "I have

3    at least 20 minutes left.  I'd like to continue the line of

4    questions.  We can put that on the record."

5          And he said, "No, I don't want the particulars.  We're

6    going to have to get an order from the Court and if we can't

7    get it this afternoon, we'll have to do something after the

8    Court rules on the motion."

9          Remember, this occurred in New York.  I traveled to

10   New York.  There was a videographer there.  There was a court

11   reporter there.  There were a number of client representatives

12   also there.  The desire was to get the deposition done.

13         **THE COURT:**  No, I hear you.

14         **MR. ECKHAUS:**  There was --

15         **THE COURT:**  I hear you.

16         **MR. ECKHAUS:**  There was no willingness on the part of

17   Mr. Eckhaus to put something on the record even if we needed to

18   do it on an attorneys'-eyes-only basis, which is what I offered

19   off the record.  At this point, it's very, very limited

20   instruction and we wanted to continue.  And we did -- we did

21   continue.

22         And, from my point of view, the Judge's protocol is pretty

23   clear as well as judges in our district are pretty clear.  You

24   take the deposition and you get rulings later.  We had --

25         **THE COURT:**  No, I know what the -- I agree with -- I

1  agree with that.  That's what I said.  That's what I said.

2      I mean, the --

3          **MR. RUSSO:**  (Speaking over.)

4          **THE COURT:**  The question is, what's the utility of it

5  now?  And what's the utility of it ever as --

6          **MR. ECKHAUS:**  I -- I --

7          **THE COURT:**  -- far as part of the relief that's going

8  to be fashioned?

9          **MR. ECKHAUS:**  Right.  Because Mr. Russo's

10  representation is just not accurate.  I mean, I -- I hate to

11  say that because I know he's trying to resolve it, and I have

12  the transcript right in front of me.  I -- I -- I -- I mean,

13  I -- We can -- Maybe we can read -- read -- read the end of it.

14      But can -- The -- The Court -- The answers were given from

15  the -- from the witness stand.

16          "Can youo be more specific?"

17          "MR. RUSSO:  No, I can't."

18      Then I said:  "Can we have a year?"

19          "MR. RUSSO:  I'd like the question answered the

20          way (unintelligible) as necessary.  I have no problem

21          calling the District Court on this."

22      Me:  "I object to the question.  Let's call the

23          District Court.

24          "MR. RUSSO:  (Unintelligible) the District

25          Court."

 1      I mean, there's no -- the whole speech he just gave didn't

 2  happen here.

 3          THE COURT:  He said --

 4      MR. ECKHAUS:  (Speaking over.)

 5      THE COURT:  He said it happened off the record.  It's

 6  definitely not in the transcript.  He said -- He said that

 7  happened off the record.

 8      Then he -- he said that when you finished trying to get

 9  ahold of me, which you couldn't, that there was at least 20

10  minutes left.  He wanted to continue and you said no.

11      And, of course, that's not in the transcript.  But he's

12  representing that that's what happened after.

13          MR. RUSSO:  We were in New York.  We -- We had made a

14  special trip.  And, factually, Your Honor should understand, we

15  had been before a District Judge in the Southern District of

16  New York on a third-party subpoena where his employer, EBS, was

17  refusing to produce witnesses.  That judge ordered that they

18  had to produce witnesses.

19      And so it was very clear we're going forward with

20  depositions, both of Mr. Tolat and of those witnesses in

21  New York.  Contextually, every argument had been made by EBS

22  not to have their witnesses appear.

23          THE COURT:  No, I --

24      MR. RUSSO:  (Unintelligible).  That was the procedure

25  in the District Court of New York.

1          **THE COURT:**  So -- So -- So I under --

2       **MR. RUSSO:**   (Speaking over.)

3       **THE COURT:**  So here's the thing.  Here's where we are.

4     So, my take-away from all of this is, I mean,

5  understanding Mr. Tolat's attorney's objections to it, it's

6  complicated -- right? -- in my own case.  This isn't my own

7  case.  This is Judge White's case, so it gets complicated.

8     A straight-up reading of the Standing Order, while the

9  evidence is skirting what's appropriate, you know, the --

10 the -- the approach under the rules and under the -- and under

11 Judge White's order that captures the rules is answer because

12 the objections are reserved.

13     And then the issue was what relief would be fashioned.  In

14 my own case, I'd say, well, you know, you have the information

15 you need.  Don't do it again from -- You know, you risk -- you

16 risk -- Objections are reserved.  And -- and -- and then if

17 there's really information that you think you need to make

18 your -- You know, you -- you have everything.  If this case

19 were to ever go to trial, you have everything you need to ask

20 them about it and you would get -- They would eliminate -- You

21 couldn't ask them about it and Judge White would grant it.

22     So that's dealt probably -- Unless there's some relevance

23 I'm not ascertaining, because it's just a distraction for a

24 bunch of different reasons.  It's exactly the kind of thing

25 that devolves into kind of a mini trial, and why they fired

1  him, and people's personal kind of ideas don't -- The fact that

2  you necessarily -- The fact of a business relationship, and all

3  of a sudden, you get enormously distracted from the claims that

4  you raised here.

5  So, for now, I'm going to say I think, you know, from --

6  from the Rule's perspective, I think you're right.  At the end,

7  I'm going to, you know -- you know, put off what any remedy

8  might be.

9  Certainly not with 20 minutes left under your own view of

10  things or, you know, less than half an hour left, that --

11  that -- that it's -- You're going to get a full day of

12  deposition.

13  And what I can tell you is, if I were to order any

14  relief -- which I'm not inclined to -- it's just going to

15  derail any hope of settlement that you have.

16  And everybody knows that this is a factor.  And it is a

17  factor that -- that influences settlement and is -- I guess

18  probably would be a favorably factor for Integral because a

19  question mark remains.  And you got that already.  And that's

20  the only utility of it and you've got it.

21  So I think that that's where we are for today.  And so I

22  wouldn't -- This isn't a forever thing, necessarily.  If

23  there's some relevance I'm missing and you come back to me and

24  say, "Well, they should have done it," and I'm like -- and I

25  can say, "You're right," and then we figure out how to

1  accomplish what you need to do.  So I think that's -- I think

2  that's just a big distract -- distraction.

3      So let's talk about the -- the electronic information, if

4  we could now quickly, and see if we can --

5          **MR. ECKHAUS:**  We've -- We've already -- We -- We've

6  offered already -- Which I think this goes a long way toward

7  saying this matter resolved.

8      We offered -- We've offered that they can have -- that

9  Integral can have access to -- to Dr. Tolat's Dropbox account,

10 you know, with whatever -- whatever -- whatever -- whatever

11 purpose they want.

12     As far as the personal hard drive which they asked for,

13 there's going to probably be personal information on it.

14 And -- And I think what -- what -- what Mr. Russo's position

15 is, that even though he probably deleted the file, it could be

16 somehow reconstituted.  Therefore, the contents of the files

17 weren't really deleted.  It's sort of circular argument.

18     My view is that the concern that he had, information

19 that's on that processor can be restored on the personal drive.

20     Let's have a third-party, independent party, remove the

21 (unintelligible) they have, because -- verify it's personal and

22 then destroy the hard drive.

23          **THE COURT:**  I think --

24      **MR. ECKHAUS:**  (Speaking over.)

25          **THE COURT:**  That seems like a fine solution.

 1          **MR. RUSSO:**  No, Your Honor, we disagree.  We don't

 2  think we should have to --

 3          **MR. ECKHAUS:**  Probably --

 4          **MR. RUSSO:**  -- pay for --

 5          **THE COURT:**  He would have to pay for it.  Mr. Tolat

 6  would have to pay for it.

 7          **MR. ECKHAUS:**  Right.  We would --

 8          **MR. RUSSO:**  Your Honor, we --

 9          **MR. ECKHAUS:**  The independent expert would have the

10  whole computer because we think the --

11          **THE COURT:**  An --

12          **MR. ECKHAUS:**  -- another --

13          **THE COURT:**  -- independent expert, you -- what I would

14  suggest you do is, you -- you -- you agree to an independent

15  expert.  If you can't, ask me and I'll --

16          **MR. RUSSO:**  (Speaking over.)

17          **THE COURT:**  -- pick someone myself.

18          **MR. RUSSO:**  We have an expert -- Your Honor, we have

19  an expert that we've already retained who's done work in this

20  case.  The problem that exists here is, there were

21  misrepresentations made by Mr. Tolat and by his counsel, two

22  admissions, Judge, which resulted in a denial of the TRO.

23      They represented that he had returned everything.  The

24  truth of the matter is --

25          **THE COURT:**  They were --

 1          MR. RUSSO:  (Speaking over.)

 2          THE COURT:  -- trying to scrub the BlackBerry with a

 3  memory chip.  I --

 4          MR. RUSSO:  We're entitled --

 5          THE COURT:  I heard that.

 6          MR. RUSSO:  We're entitled to get that evidence to our

 7  expert to determine what he has had and what he has done with

 8  it, because the evidentiary trail is larger than what exists

 9  today.

10          THE COURT:  So --

11          MR. RUSSO:  (Speaking over.)

12          THE COURT:  -- I understand.

13          MR. RUSSO:  (Speaking over.)

14          THE COURT:  I understand --

15          MR. RUSSO:  (Speaking over.)

16          THE COURT:  -- but why don't --

17          MR. RUSSO:  (Speaking over.)

18          THE COURT:  -- you -- Why don't we start with a

19  mutually agreeable third-party expert to do the forensic

20  analysis and provide a report to you.  And then let's take a

21  step after that.

22       We won't order destruction of the hard drive yet, but

23  there are real people out there -- and I'm not on my computer;

24  I'm staying in the courtroom -- but I have them.  I used them

25  on my own job, you know, people --

1          **MR. ECKHAUS:**  We'd love --

2          **THE COURT:**  -- that --

3          **MR. ECKHAUS:**  We'd love a recommendation from you.  I

4    don't think --

5          **THE COURT:**  I mean, there's so many expensive in D.C.

6    that I know people use, and I've got some recommendations, but

7    you all should be able to agree to a third party that

8    Mr. Tolat's going to have to pay for.  And let's take the first

9    step of having the analysis done.

10         You may not be entitled to his personal data, so maybe we

11   can come up with a mechanism.  The expert can tell you what

12   needs to be done.  Maybe you delete the personal information.

13         But then if you want some forensic analysis about what the

14   line of spoliation might be, you know, work out what to do.

15   You're not entitled to his personal information.  And you are

16   entitled to receive some kind of analysis of what the -- what

17   might have happened.

18         I mean, your allegation is, is that the -- You know, the

19   BlackBerry is one issue.  There's a company, Dropbox, which is

20   a second issue.

21         The hard drive which is to be forensically analyzed, which

22   you previously agreed to return it to him, you just wanted to

23   get it to see what was there.  You could still do that.

24         His personal data would be returned to a new hard drive to

25   him.  The -- The -- The hard drive can be maintained in its

1   current, you know, condition, and then you can have the

2   analysis of what the -- what the -- you know, what the

3   independent expert shows.  You can meet and confer.  And

4   Mr. Tolat will have to pay for the analysis that will be done

5   by an agreed-to independent expert.

6        I'll be happy to put the names of the people that I've

7   heard about that -- you know, that are supposed to be good, but

8   you can -- and provide those to you.

9        But there are objective points of reference that, you

10  know, maybe Mr. Russo can pick who the person is, and as long

11  as Mr. Tolat has every incentive to agree as long as the person

12  is reasonable.  Just not your current person.  So maybe there's

13  somebody else.  So that's what I think there.

14       What about returning the BlackBerry card?  I mean,

15  Mr. Tolat had said, well, they've got information and

16  everything because it syncs with the servers.  They've got it

17  all, anyway.

18       And -- And -- And Integral's view is, well, you weren't

19  supposed to -- You were supposed to return it.  You weren't

20  supposed to keep the card, so --

21            **MR. ECKHAUS:**  Well, what happened, they -- they --

22  they took the position that there was a SIM card, but there

23  is -- there is no SIM card for these -- for this type of

24  BlackBerry.  The SIM card is always internal.  That's why we're

25  a little betwixt and between. I -- I --

1      **THE COURT:**  So you're representing to me that there

2  isn't a card that goes along with the BlackBerry.

3      **MR. ECKHAUS:**  There's no SIM card that goes with the

4  BlackBerry.  There may -- There may be an additional memory

5  chip which we're trying to locate, but I'm now -- I know that

6  there is no -- there's no SIM card.  We --

7      **THE COURT:**  Well --

8      **MR. ECKHAUS:**  (Speaking over.)

9      **THE COURT:**  -- if there's a memory chip, what you need

10  to do is, you need to find out whether there is a memory chip,

11  provide confirmation one way or the other whether there was one

12  and what the circumstance of -- There is -- If there isn't, say

13  that there isn't in a declaration by your client, I assume.

14  And if there isn't -- and if there is one and it's missing, say

15  what the circumstances are, produce it to Mr. Russo and then

16  we'll see where we go from there.

17      **MR. RUSSO:**  Well, Judge, you -- you see what's

18  happening here.  He retained data that he himself unilaterally

19  asserted is his personal data when Integral believes firmly

20  that this is all company contact information.

21      What he's saying is, well, you have a copy of it so you

22  shouldn't be upset, but I need to keep a copy of it as well.

23      That's what from Mr. Friedman is --

24      **THE COURT:**  So -- So -- so let's keep it to the

25  BlackBerry.  You should have a copy of the BlackBerry data.

1   It's just -- You know, I don't know what's on the BlackBerry

2   but, for example, there could be personal photographs, there

3   could be personal contacts.  There could be all sorts of

4   things.

5       You could segregate and return -- And I don't know how

6   you're supposed to deal with this.  People leave businesses all

7   the time and they're allowed to take their personal information

8   with them.

9       Phone numbers do not strike me as the kind of proprietary

10  information that someone is meant to wipe the people they know

11  clear out of their con -- you know, out of their consciousness.

12  Trade secret information, on the other hand, is different.

13      How you're allowed to use the information that you have in

14  your head, you can have a drink with somebody you used to work

15  with, and you can't -- There may be things that you can't do

16  with them from a business perspective.

17      So the way that the obli -- the employment obligation's

18  good for starts with the prism of the Employment Agreement and

19  this litigation.

20      The personal contact information on the BlackBerry just

21  seems to me to be very different.  Most people -- Maybe there

22  are some things that are as attachments to e-mails.  I mean,

23  that starts to get into the realm of whatever your data is and

24  how it \sinks\syncs, you know, and I don't know how you come up

25  with a resolution to address that.

1    But mostly people keep the digital information that you

2 care about on their computers, which gets us to the second two

3 areas that really matter:  The Dropbox account, which it sounds

4 like Mr. Tolat has agreed that you can have access to so you

5 could review it for return of confidential information.

6    And then the second -- The second thing is the personal

7 computer to make sure that company information isn't retained.

8 There is an identified hard drive, and on that hard drive would

9 be two categories of information:  Information that you think

10 is business, and information that maybe Mr. Tolat thinks is

11 personal but you say also is business; and then a third

12 category, what is truly personal.

13    I don't know -- and maybe Mr. Tolat's lawyer can tell

14 us -- in the -- You know, there's the -- there's the clear

15 business on one end and there's a clear personal on the other.

16 You're not entitled to the clear personal.

17    It seems to me that you ought to be able to identify what

18 the categories are of clear personal information, segregate

19 that out, provide a review mechanism.  If it has to be through

20 me, which I'm really not going to be happy about, fine, but it

21 seems like it could be through the third-party vendor.

22    And then I was going to say destroy the rest.  But if

23 there's some kind of forensic analysis that you care about to

24 show what he took with him, then that seems to me to be -- I

25 don't know what it would show, because if he deleted stuff from

 1  his personal computer, you wouldn't expect him, leaving the

 2  company, to get rid of his hard drive.  You would expect him to

 3  delete all information from his personal computer.

 4      It seems to me that destroying the hard drive takes care

 5  of what you want, which is, you know, return of -- you know,

 6  not retaining through any possible mechanism any company

 7  information and confirming that the information he's keeping is

 8  truly personal.  And that can be accomplished through a

 9  third-party vendor.  I think that's the solution.

10      **MR. RUSSO:**  So I can be clear Your Honor, those that

11  are destroyed, we don't want a situation where there's

12  information and evidence that's been destroyed that should be

13  preserved and should be available for experts to look at.

14      **THE COURT:**  Okay.  I -- I think we can manage that for

15  now, but the mechanism would be that the personal data would be

16  returned.  It would be returned, you know, in a separate new

17  hard drive that would be -- be available to Mr. Tolat for his

18  personal use.

19      You guys have to meet-and-confer about what that personal

20  information is.

21      **MR. ECKHAUS:**  (Speaking over.)

22      **THE COURT:**  There's so much information that he may

23  not want returned to him and that Integral shouldn't have

24  access to, either.  But I have no problem with not destroying

25  the hard drive now while the litigation is ongoing.

1      **MR. ECKHAUS:**  I would like it destroyed after the

2   personal information's removed.

3      Assuming we -- Assuming that we independently verify that

4   the files were deleted when Mr. Tolat went to leave --

5      **THE COURT:**  We don't have to rush everything.  We'll

6   see how it goes in the litigation.

7      Certainly the contemplation at the end would be after the

8   litigation is concluded.  But for right now, given that we're

9   in discovery, let's get -- let's get it analyzed.  Let's --

10  Let's get the personal information segregate -- identified and

11  then segregated to conclude that it's truly personal

12  information.

13     And then if there's something that Mr. Russo thinks a

14  forensic analysis will reveal -- Right now I'm saying that the

15  issue is with the BlackBerry.  Certainly, again, you know that

16  through the course of his em -- Maybe you were concerned that

17  there were inappropriate transmissions of company personal

18  information within a defined time period after -- or when

19  Mr. Tolat left the company as opposed to information that was

20  already on the home computer because that's just how people use

21  their home computers when they work for people.

22     Right now, let's get it to a third-party vendor, get the

23  personal information extracted, and have it retained for now

24  until we sort out what ought to happen to it.

25     It doesn't mean to me that a large expenditure -- And,

1  again, it provides a litigation frame of reference for

2  Mr. Tolat and preserves Integral's settlement posture.  And you

3  guys need to work, it seems to me, in the context of the -- You

4  know, you guys are on a fast-track for discovery, which means

5  that you really want to eliminate what the possibilities are

6  to -- as to whether the parties involved -- by the parties, I

7  mean, really, the parties, Integral's CEO and Mr. Tolat, have

8  some kind of incentive to bury the hatchet and to move forward

9  with their -- with their endeavors.

10       **MR. RUSSO:**  I think the problem, Your Honor -- And I

11  think your -- your ideas are noble as far as mediation

12  (unintelligible) but the problem is, until there's a three-fold

13  full disclosure by Mr. Tolat, the continued pattern of deceit

14  that Integral believes have occurred will prevent any

15  mediation --

16       **THE COURT:**  Yeah.  But here's a --

17       **MR. RUSSO:**  (Speaking over.)

18       **THE COURT:**  But here's a little -- And I don't think

19  that's true because here's what we'll accomplish:  We will take

20  away.  You will verify the Dropbox.  You will have returned the

21  memory chip or an explanation under penalty of perjury about

22  what's going on with it.

23       You will have a -- So you will have -- You'll have access

24  to the Dropbox, a complete recapture of the BlackBerry and with

25  a declaration under penalty of perjury which, for good or for

1  bad, is the best you can get, because either he has to return,

2  which I'll order it if he he has it.  If he doesn't, he has to

3  provide an explanation.

4       Then the issue becomes the computer, and the personal

5  computer.  To the extent that there is a -- a concern that

6  Mr. Tolat has data, this will alleviate that concern

7  100 percent, unless he's -- Maybe he can also provide a -- If

8  it's -- If you think it ends up being necessary for mediation,

9  he can provide some -- we can talk about that later, what you

10 need to close the loop on.  But we'll get it out of his hands.

11 It'll preserve your ability to analyze it.

12      The company -- All other things on the company computer,

13 you're going to be able find that out through your network.

14 And it went to Dropbox, anyway, and that's how it would happen.

15      Whatever information he had on his personal hard drive,

16 you'll be able to verify through the forensic analysis on a

17 pretty good level the state the hard drive, and I think

18 that's at Mr. Tolat's expense.

19      It's not -- It's not a (unintelligible).  It isn't minor,

20 we won't destroy anything right now.  We'll maintain that

21 status quo, and that is all the elimination that's

22 accomplishable, you know.

23      And having more -- another crack at Mr. Tolat to ask about

24 his -- what you think are his bad behaviors, when everybody

25 knows what the lay of the land is, anyway, it's not going to

1   help your client, either.

2       So if your client needs more, there's only a certain

3   amount you can achieve in litigation and usually that boils

4   down to money.  And a good mediator will facilitate some kind

5   of reconciliation, at least, so people can move forward with

6   their lives.

7       **MR. ECKHAUS:**  Your Honor, that's all fine your

8   recommendations are fine with me.

9       **THE COURT:**  All right.  Mr. Russo, I think that's kind

10  of how we plan to proceed.  But this is to try to maintain --

11  try to restore to what it should be as best as we can, and

12  preserving your ability to get more if there is more if you

13  can't resolve the case, but illuminating as best we can for

14  your client.  Okay?

15      **MR. RUSSO:**  My -- My whole thinking, Your Honor, is

16  there has been additional destruction of evidence since the

17  start of this dispute at the end of last year, and so I'm

18  hoping --

19      **MR. RUSSO:**  I just wish he would stop the accusations.

20  I mean, I just can't tell you how I think.  Every time you

21  start this, I mean, you now -- you know that none of this stuff

22  is true and you keep on saying it.  I just don't understand why

23  you're doing it.

24      I really -- I really wish you would -- you would read the

25  record or pay attention to what's going on.

1          **THE COURT:**  Well --

2          **MR. ECKHAUS:**  This is litigation.  It's not

3    productive.

4          **THE COURT:**  Everybody gets heated when -- when in

5    litigation, and especially when they're on the phone and not at

6    the same table.

7          So I hope whatever your mediation is, it's in person,

8    so . . .

9          And -- And -- And from the client's perspective, you --

10   you both know this because good lawyers are all about, you

11   know, helping their clients achieve resolution.  And the combat

12   of litigation usually doesn't make anybody feel any better

13   after it's over.

14         And so I -- Let's try to get the discovery problems sorted

15   out, and let's try to get your clients in the room so they can

16   see if they can fix their problems.

17         **MR. ECKHAUS:**  Your Honor, could -- could we arrange

18   for some way to take get the names of some of the experts

19   that -- that you think would be available?

20         **THE COURT:**  Yeah, I'll -- I'll look to see what I

21   have, either recommendations -- I have some recommendations

22   that the FBI gave me, so --

23         **MR. ECKHAUS:**  That would be great.

24         **MR. LUX:**  Your Honor, this is -- this is Rob Lux.  I'm

25   sorry to interrupt you.  I'm with Jack Russo's office.

1          **THE COURT:**  Yeah.

2          **MR. LUX:**  I just want to bring up one other thing from

3    the brief which we included, which were the evidence that

4    Dr. Tolat has downloaded a very large, large amount of source

5    code.

6          **THE COURT:**  All right.  Right, right, right.  Sorry.

7       He needs to return any source code he took from Integral.

8    That's -- That's part of the order.  Sorry.  That's pretty

9    obvious.

10          **MR. ECKHAUS:**  He didn't take any.  He told you last

11    time.  They've got -- They've got the laptop.

12          **MR. LUX:**  Your Honor, that actually is not -- that is

13    not consistent with Mr. Tolat's declaration.  What he quoted in

14    his declaration is very clear evidence, actually, that

15    Dr. Tolat likely transferred the source code onto a third

16    device, and it's in Mr. Tolat's declaration.  He really has

17    significant evidence.

18          **MR. ECKHAUS:**  The independent --

19          **MR. LUX:**  (Speaking over.)

20          **MR. ECKHAUS:**  The independent expert can take --

21          **THE COURT:**  So we're going to not -- have an

22    independent expert and if Mr. Russo -- Mr. Russo's firm and you

23    all think there's somebody better and -- and -- and, from

24    Mr. Tolat's perspective, you've got every incentive to comply

25    with that.

 1       I think that you ought to be able to agree mutually on an

 2  expert.  If you can't, as I said, I can decide.

 3       I think that Mr. Russo's view of what ought to happen

 4  is -- is -- is important here for -- for dependability, and the

 5  order will include an order that he return any source code.

 6       It'll cover all those things.  And my Number 5 was the

 7  source code.  I just -- You know, he -- he's -- he says he

 8  doesn't have it.  He says he didn't transfer it.  The forensic

 9  analysis will reveal more, and -- and the order will be to

10  return any source code he has to Integral.

11       **MR. ECKHAUS:**  Thank you.

12       **THE COURT:**  Okay.

13       **MR. RUSSO:**  That's great, Your Honor.

14       **THE COURT:**  Thank you.

15       **MR. LUX:**  Thank you, Your Honor, for your

16  recommendations.

17       **MR. ECKHAUS:**  Do we -- Will you include that or would

18  we be cantankerous to --

19       **THE COURT:**  Yeah, I'll -- I'll do it.  I'll -- I'll

20  issue some -- I'll issue an order.

21       Then, you know, I -- These aren't people I used myself.

22  These are just people who were told to me.  But I'll -- I'll

23  find a way -- I'll commit it to you guys.

24       But, again, Mr. Russo should have it, you know.  I would

25  say that you should agree on a mutually agreeable one with the

1  deference given to what Mr. Russo thinks.

2        I'll happily share, just because I did some intel on this

3  recently because there was an analysis -- a computer analysis

4  of a com -- a forensic issue with the Court and they were

5  looking to recover stuff.

6        And I was told that -- Again, I'm not at my desk but I can

7  tell you when I'm at my desk.  But there's somebody out of D.C.

8  who's supposed to be very good, expensive but good.  And

9  there's somebody else, I think, that was told to me at the same

10 time and I can easily pull that out and I'll -- I'll share it

11 with you guys.

12        **MR. ECKHAUS:**  Thank you.

13        **MR. RUSSO:**  Thank you.

14        **MR. LUX:**  Thank you very much, Judge.

15        **THE COURT:**  All right.

16                 (Court adjourned at 4:10 p.m.)

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____
Candace Yount, Transcriber

Monday, April 14, 2014